IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TWO CONDOMINIUMS LOCATED AT 465 OCEAN DRIVE, UNITS 315 AND 316, MIAMI BEACH, FLORIDA 33139,<br><br>Defendant. | Case No. 21-cv-04060-CRB<br><br>**ORDER GRANTING MOTION TO DISMISS CIVIL FORFEITURE COMPLAINT** |

Zachary Apte and Jessica Richman co-founded uBiome, Inc. in 2012. Compl. ¶¶ 8–10. As the government explains, uBiome "purported to test patients 'microbiomes' with the ostensible purpose of allowing consumers to understand the bacterial composition of their various organ systems." Opp. (dkt. 28) at 1. In separate related proceedings, the government has charged Apte and Richman with numerous federal crimes based on their conduct while leading uBiome. See United States v. Apte et al, No. 21-cr-00116-CRB, Indictment (dkt. 1). The government generally alleges that uBiome scammed patients, health care companies, and investors. See id.

Here, the government has filed a complaint for civil forfeiture of two Miami, Florida condominiums. See Compl. (dkt. 1) ¶¶ 26–37. The government alleges that the Miami condominiums were involved in a money laundering transaction and constitute the proceeds of Claimants Apte and Richman's health care fraud, securities fraud, and wire fraud. Id. Apte and Richman have moved to dismiss the government's civil forfeiture complaint. See Mot. to Dismiss (dkt. 25). The Court determines that no oral argument is necessary. The Court grants Apte and Richman's motion to dismiss with leave to amend.

## I.     BACKGROUND

According to the government, Apte and Richman used uBiome to defraud health care providers and health insurance benefit programs from 2015 to 2019.  Compl. ¶¶ 12–13.  The alleged fraud included various "practices designed to deceive approving health care providers and health care benefit programs with respect to tests that were not validated and not medically necessary."  Id. ¶ 13.  uBiome also "falsified documents" and "concealed material facts when insurance providers asked questions."  Id.  More specifically:

> These practices included (1) fraudulently submitting reimbursement claims for re-tests or re-sequencings of archived samples (referred to internally as "upgrades"); (2) utilizing a captive network of doctors . . . and other providers who were incentivized to approve tests, but who were intentionally given partial and misleading information about the test requests they were reviewing; (3) fraudulently submitting reimbursement claims with respect to tests that had not been fully validated . . . and/or for which patient test results had not yet been released; (4) manipulating dates of service to conceal uBiome's actual testing and marketing practices from insurance providers, and to try to maximize billings; (5) fraudulently not charging patients for patient responsibility required by insurers, and instead, in some cases, incentivizing them with gift cards, and then making misleading statements about or concealing those practices from insurance providers; and (6) falsifying documents, using the identity of doctors and other health care providers without their knowledge or authorization . . . and lying to insurance providers in response to requests for information, overpayment notifications, requests for recoupment of billings, denials of reimbursement requests, and/or audits investigating uBiome's billing practices.

Id.  As a result, uBiome obtained over $3 million in reimbursements from health care benefit programs in 2017 and over $26 million in 2018.  Id. ¶¶ 12, 18.  The government's civil forfeiture complaint does not provide more specifics regarding the timing of these reimbursements, or whether uBiome fraudulently obtained other funds at other times from health care providers or benefit programs.

The government also alleges that Apte and Richman engaged in securities fraud from 2015 to 2019 by taking measures "to deceive and mislead investors about various aspects of uBiome's business including, but not limited to, the success of uBiome's

2

business model in terms of revenues and reimbursement rates; the threats to future revenues represented by uBiome's failure to collect patient responsibility [fees], marketing of upgrades, and reliance on the [captive network of doctors] to generate orders; and the lack of clinical utility and acceptance in the medical community of uBiome's tests." Id. ¶ 15. These efforts included "various material misrepresentation and false and misleading statements and omissions to investors." Id. As a result of this scheme, uBiome obtained roughly $15 million in a 2016 Series B financing, $9 million through the sale of convertible notes in July and August 2017, $1.8 million through the sale of promissory notes in "early 2018," and over $30 million in an August 2018 Series C financing during which Apte and Richman collectively sold roughly $10 million of their personal shares. Id. ¶¶ 17–19.

Starting "[n]ear the end of 2016," Apte and Richman began "funneling funds from the uBiome account to their personal accounts." Id. ¶ 17. This included roughly $1.2 million into Apte's accounts and $600,000 into Richman's accounts. Id. The complaint does not indicate for how long this "funneling" continued. In August, September, and October 2017, Apte and Richman set up a "Juniper Revocable Trust" account, transferred roughly $100,000 from their personal accounts into the Juniper Revocable Trust account, then used those funds to for a down payment on a Camas, Washington property. Id. ¶ 20. Apte and Richman then made mortgage payments on the property by transferring additional funds from their personal accounts to Wells Fargo Bank. Id. ¶ 21. The government alleges that these funds "are traceable to the proceeds of" Apte and Richman's unlawful schemes. Id.

Apte and Richman sold the Camas property in January 2020. Id. ¶ 22. The proceeds were held in an attorney's trust account. Id. Using cash that had mostly been transferred from that trust account, Apte and Richman then bought two condominiums located at 465 Ocean Drive (Units 315 and 316) in Miami Beach, Florida. Id. According to the government, "these properties are involved in money laundering" because this "series of complicated financial transactions" indicates "that the purpose of the transfer

was to conceal the nature, source, and location of the proceeds" of Apte and Richman's unlawful schemes. Id.

Based on these allegations, the government is seeking forfeiture of the Miami condominiums. Id. at 11.

## II. LEGAL STANDARD

18 U.S.C. § 981 makes property "involved in" or "traceable to" conduct that violates various criminal statutes subject to forfeiture. As relevant here, § 981(a)(1)(A) makes property involved in a money laundering transaction in violation of 18 U.S.C. § 1956, plus property "traceable to such property," subject to forfeiture. Similarly, § 981(a)(1)(D)(vi) makes property traceable to wire fraud in violation of 18 U.S.C. § 1343 subject to forfeiture. And along the same lines, § 981(a)(1)(C) makes property traceable to "any offense constituting 'specified unlawful activity'" subject to forfeiture. "[S]pecified unlawful activity" includes any "[f]ederal health care offense," see 18 U.S.C. § 1956(c)(7)(F), and "fraud in the sale of securities, see 18 U.S.C. §§ 1956(c)(7)(A); 1961(1)(D).

The parties agree that a civil forfeiture complaint must at least state facts that, when accepted as true, "state a claim to relief that is plausible on its face." See Mot. at 3 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)); Opp. at 4 (citing Iqbal, 556 U.S. at 678). In addition to that ordinary rule of civil procedure, "[i]n rem civil forfeitures are conducted in accordance with the Supplemental Rules for Certain Admiralty and Maritime Claims." United States v. Real Prop. at 2659 Roundhill Dr., 194 F.3d 1020, 1024 n.3 (9th Cir. 1999). Two Supplemental Rules are relevant here.

Supplemental Rule G(2)(a) provides that the government's civil forfeiture complaint must "be verified." Under 28 U.S.C. § 1746, when "any rule" provides that "any matter" must be verified, "such matter" may be verified

> as true under penalty of perjury . . . in substantially the following form:
> . . .
> (2) If executed within the United States . . . : "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

4

> Executed on (date).
> (Signature)

The Ninth Circuit has held that precise compliance with this formulation is not necessary, and has approved a similar verification stating that the facts in the complaint were "true and correct <u>as known to me</u>." <u>See</u> <u>Schroeder v. McDonald</u>, 55 F.3d 454, 460 n.10 (9th Cir. 1995) (emphasis in original).

Supplemental Rule G(2)(f) provides that the complaint must state facts detailed enough "to support a reasonable belief that the government will be able to meet its burden of proof at trial." In civil forfeiture proceedings, the government must prove that the defendant property is subject to forfeiture "by a preponderance of the evidence." 18 U.S.C. § 983(c)(1). That means in addition to stating a claim for relief that is plausible on its face, <u>see</u> <u>Iqbal</u>, 556 U.S. at 678, the complaint must state facts detailed enough to support a reasonable belief that the government will be able to establish "by a preponderance of the evidence" that the relevant property was involved in, or traceable to, unlawful conduct, <u>see</u> 18 U.S.C. §§ 981(a); 983(c)(1). The Ninth Circuit has interpreted the Supplemental Rules to require that a complaint "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." <u>United States v. Aguilar</u>, 782 F.3d 1101, 1108 (9th Cir. 2015) (quotation omitted). Although this is a "higher standard" than notice pleading, it remains a "low bar." <u>Id.</u> at 1109 (quotation omitted).

Because these principles control how the government must plead the elements of a civil forfeiture claim, they apply equally to an assertion that property is traceable to the proceeds of unlawful conduct. <u>See</u> 18 U.S.C. § 981(a)(1). Thus, when asserting a forfeiture theory based on tracing, the government must at least plausibly allege tracing. But given the Ninth Circuit's statement that "tracing is not at issue at the motion to dismiss stage," <u>Aguilar</u>, 782 F.3d at 1110, the government is not required to produce evidence showing a full tracing sequence or allege detailed facts about each link in such a sequence,

see, e.g., Medina-Rodriguez v. $3,072,266.59 in United States Currency, 471 F. Supp. 3d 465, 480–81 (D.P.R. 2020). Thus, the government must establish the general contours, but not the minute details, of the chain linking the property at issue back to unlawful conduct.

### III.  DISCUSSION

Here, the complaint was properly verified. But the government has not adequately pleaded that the Miami condominiums are subject to forfeiture as traceable to the proceeds of unlawful conduct or as involved in a money laundering offense. Therefore, the Court grants Apte and Richman's motion to dismiss with leave to amend.

#### A.  Verification

The government's civil forfeiture complaint contains the following verification:

> I, Elaine Farrell, state as follows:
>
> 1.    I am a special agent with the Department of Defense Office of Inspector General, Defense Criminal Investigative Service. I am an agent assigned to this case. As such, I am familiar with the facts and the investigation leading to the filing of this Complaint for Forfeiture.
>
> 2.    I have read the Complaint and believe the allegations contained therein to be true.
>
> \* \* \* \* \*
>
> I declare under penalty of perjury that the foregoing is true and correct. Executed this 25 day of May, 2021, in Oakland, California.
>     (Signature).

Verification (dkt. 1, appended to Compl.) at 1. Apte and Richman argue that this verification is inadequate because "rather than attesting that the allegations . . . are true and correct to the best of the agent's knowledge, the verification states only that the agent 'believe[s] the allegations contained [in the complaint] to be true.'" Mot. to Dismiss at 11 n.7.

Apte and Richman's argument fails as a matter of law and epistemology. Schroeder approved a verification stating that the allegations in a complaint were "true and correct as known to" the agent. 55 F.3d at 460 n.10 (emphasis in original). The verification here, stating that the agent is "familiar with the facts and the investigation" and "believe[s] the

6

1  allegations . . . to be true," is not meaningfully distinguishable.  See Verification at 1.
2  Indeed, Apte and Richman rely on a case approving a verification stating that allegations
3  are true and correct "to the best of [the agent's] knowledge and belief."  United States v. 8
4  Gilcrease Lane, Quincy Fla. 32351, 587 F. Supp. 2d 133, 139 (D.D.C. 2008) (emphasis
5  added).  Statements of knowledge are often couched in terms of belief.  This may signal
6  little more than the declarant's understanding that "[a]nything is possible in a world of
7  quantum mechanics."  See United States v. Watkins, 983 F.2d 1413, 1424 (7th Cir. 1993)
8  (Easterbrook, J., dissenting).  Of course, a statement of mere belief, without any
9  accompanying information establishing a foundation of knowledge, would be worthless.
10 But that is not the case here because Agent Farrell explained her familiarity with the
11 relevant facts.
12     Accordingly, the government's complaint satisfies Supplemental Rule G(2)(a)'s
13 verification requirement.

### B. Pleading

The government's complaint, however, is not adequately pleaded.  The government alleges that the Miami condominiums are traceable to health care fraud, securities fraud, and wire fraud, and that the Miami condominiums were used in a money laundering transaction.  The allegations supporting each forfeiture theory lack basic, necessary information.  And the Court cannot ignore these fundamental (if technical) omissions.

#### 1. Health Care Fraud

The government's complaint does not adequately allege that the Miami condominiums are traceable to the proceeds of health care fraud.

On the one hand, the government's allegations, taken as true, establish that Apte and Richman committed a health care fraud offense—and these facts are detailed enough "to support a reasonable belief that the government will be able to meet its burden of proof" regarding that underlying offense.  Supp. R. G(2)(f).  18 U.S.C. § 1347(a) makes it a federal crime to "knowingly and willfully" carry out "a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of fraudulent pretenses,

7

1  representations, or promises, any of the money or property owned by, or under the custody
2  or control of, any health care benefit program, in connection with the delivery of or
3  payment for health care benefits, items, or services." Here, the complaint alleges that Apte
4  and Richman defrauded health care benefit programs in numerous specific ways. See
5  Compl. ¶¶ 12–13, 18. Contrary to Apte and Richman, these allegations are neither
6  "cursory" nor "unexplained." Mot. to Dismiss at 5 n.4.

On the other hand, the government has not adequately pleaded that Apte and Richman used the proceeds of the health care fraud to eventually purchase the Miami condominiums. The issue is timing. The government's complaint explains that uBiome received over $3 million through hundreds of transactions "in 2017" and over $26 million through thousands of transactions "in 2018." Compl. ¶¶ 18–19. The complaint further explains that Apte and Richman "began funneling funds" from uBiome to their personal accounts "[n]ear the end of 2016." Id. ¶ 17. Apte and Richman bought the Camas property in September 2017, sold the property in January 2020, and bought the Miami condominiums in February 2020. Id. ¶¶ 20–22. The problem is not that these allegations are insufficiently detailed; the problem is that they fail to establish even the basic contours of a chain linking the Miami condominiums to the health care fraud. Apte and Richman "began" funneling themselves money in late 2016, but the complaint does not indicate how long they continued to do so. And although Apte and Richman concocted the health care fraud scheme starting in 2015, the complaint does not indicate that uBiome began reaping the benefits of the scheme until some unknown point in 2017. Thus, based on the complaint, Apte and Richman may have ceased funneling money into their personal accounts before uBiome financially benefited from the health care fraud. Indeed, Apte and Richman's September 2017 purchase of the Camas property may have occurred before uBiome financially benefited from the fraud. Without more basic information, there is no way to tell.

The government need not provide significant additional details to adequately allege that the Miami condominiums are traceable to the proceeds of the healthcare fraud scheme.

1  See Aguilar, 782 F.3d at 1109–10.  But to clear the applicable "low bar," id. at 1009, the
2  government must at least provide a basic timeline supporting that inference.  It would be
3  enough to show that uBiome benefited from the scheme before Apte and Richman stopped
4  transferring themselves money from uBiome and before Apte and Richman purchased the
5  Camas property.
6      For now, the government's non-conclusory allegations, if true, would not entitle the
7  government to relief.  Therefore, the government has failed to plausibly allege that the
8  Miami condominiums are forfeitable as traceable to the proceeds of the health care fraud
9  scheme.  See Iqbal, 556 U.S. at 678

### 2. Securities Fraud

The government's allegations that Apte and Richman engaged in securities fraud are similarly inadequate.

15 U.S.C. § 78(j)(b) makes it a federal crime to, "by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange," "use or employ, in connection with the . . . sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  17 C.F.R. § 240.10b-5, in turn, makes it unlawful to, "in connection with the . . . sale of a security," and "by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange," "employ any device, scheme, or artifice to defraud," to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading," or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

The government alleges that from 2015 to 2019, Apte and Richman took measures "to deceive and mislead investors about various aspects of uBiome's business." Compl. ¶ 15.  These efforts included "various material misrepresentation and false and misleading statements and omissions to investors."  Id.  As a result, uBiome obtained roughly $15 million in a 2016 Series B financing, $9 million through the sale of convertible notes in

July and August 2017, $1.8 million through the sale of promissory notes in "early 2018," and over $30 million in an August 2018 Series C financing. Id. ¶¶ 17–19.

As with the government's health care fraud claim, the government must provide slightly more information—explaining the basic temporal relationship between Apte and Richman funneling money to their personal accounts and the relevant fraudulently induced investments—to establish the general contours of its tracing theory. Because the government has not established the specific timing of (i) Apte and Richman's transfers to themselves; and (ii) the investments constituting the 2016 Series B financing, the Court is unable to infer that Apte and Richman may have used the proceeds of the alleged securities fraud to purchase the Camas property. And given that the Camas transaction was part of the chain leading to the Miami condominiums, the Court cannot presently discern the relevance of any investments in uBiome that occurred after the Camas property purchase.

In addition to this tracing issue, the government's securities fraud theory fails for another, independent reason. The government has not alleged that Apte and Richman used "any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange," to facilitate this securities fraud. Therefore, the government has not plausibly alleged any underlying violation of 15 U.S.C. § 78j.[1]

The government's argument that it need not expressly allege this element of securities fraud is unpersuasive. See Opp. at 4. The government argues that the complaint's mere "reference to transfers between and among financial institutions" necessarily establishes that Apte and Richman used instrumentalities of interstate

---

[1] The Court need not decide whether the government's failure to describe any specific misstatement or omission is also fatal to the government's allegations of securities fraud. Of course, the government need not provide the sort of detailed allegations that the Private Securities Litigation Reform Act requires of private plaintiffs. See 15 U.S.C. § 78u-4(b). But while the complaint describes the general topics about which Apte and Richman allegedly misled investors, Compl. ¶ 15, it is dubious whether assertions so broad enable Apte and Richman to meaningfully investigate the facts and draft a responsive pleading. See Aguilar, 782 F.3d at 1108–09. Moreover, the criminal indictment against Apte and Richman describes numerous more specific misrepresentations. See, e.g., United States v. Apte et al, No. 21-cr-00116-CRB Indictment ¶¶ 57, 84. So it should be no trouble for the government to plead a small amount of similar information here without providing "discovery far beyond what is required at this juncture." See Opp. at 1.

commerce to carry out their scheme. Id. But the government alleged nothing about these banks' activities in interstate commerce. The government's argument amounts to this: because the government could have easily alleged the interstate commerce element of securities fraud, the Court should not require it to do so. But that begs the question why the government did not expressly allege this element in the first place. There is a fine line between drawing reasonable inferences in favor of the government (as the Court must) and permitting the government to cut corners. Approving the complaint in its current form would place the Court on the wrong side of that line.

### 3.     Wire Fraud

A person who,

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice[,]

commits wire fraud in violation of 18 U.S.C. § 1343.

Aside from citing § 1343, the government's complaint did not expressly allege wire fraud. Compl. ¶¶ 25, 36. The government argues that this is no problem; the complaint shows that Apte and Richman "caused several transfers of funds to be made in furtherance of their scheme to defraud various healthcare benefit programs and investors," and such transfers "constitute wires for purposes of the wire fraud statute." Opp. at 12 (citing United States v. Cusino, 694 .2d 185, 187 (9th Cir. 1982)). The government also argues that the complaint "explains the paths of the various transfers made to Apte and Richman in furtherance of their scheme." Id.

Once again, the gaps in the government's complaint are too conspicuous to ignore. Assuming that the government is permitted to implicitly assert a forfeiture theory based on wire fraud, and assuming that mere mentions of "transfers" between financial accounts suggest wire transfers in interstate commerce, for the reasons already discussed, the government has not adequately pleaded the basic contours of the chain linking any

11

1  fraudulent wire transfers to the Camas property transaction and (in turn) the Miami
2  condominiums. When it amends its complaint, to avoid unnecessary litigation, the
3  government might also consider actually articulating its wire fraud forfeiture theory.

### 4. Money Laundering

Under 18 U.S.C. § 1956(a),

> (1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
> (A)
>  (i) with the intent to promote the carrying on of specified unlawful activity; or
> . . .
> (B) knowing that the transaction is designed in whole or in part—
>  (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . .

is guilty of money laundering. 18 U.S.C. § 1956(a)(1)(A)–(B). The government's complaint alleges that the Miami condominiums are alternatively forfeitable because the series of transactions leading to their purchase was "designed to conceal the illicit nature of funds," such that the condominiums are "involved in money laundering" under 18 U.S.C. § 981(a)(1)(A).

This theory of forfeiture fails for the same reasons already discussed. The government's allegations, if true, show that Apte and Richman engaged in (at least) health care fraud. The allegations also show that Apte and Richman transferred money from uBiome to their personal accounts and used that money to purchase the Camas property and later the Miami condominiums. But the government's allegations are too vague to plausibly connect the unlawful activity to the relevant transactions. The allegations thus fail to indicate that the Miami condominiums transaction was part of a scheme to conceal the proceeds of any particular unlawful activity. Because the complaint fails to lay out a clear sequence of events, the Court is unable to conclude that the government has adequately pleaded this alternative forfeiture theory.

\*

The government's forfeiture theories all suffer from similar defects. Whether or not Apte and Richman's motion is a "thinly veiled effort to elicit discovery from the government," Opp. at 1, the government can fix its complaint by providing limited yet crucial information. And because the required information is no more detailed than similar information that the government has already provided in the criminal indictment, see United States v. Apte et al, No. 21-cr-00116-CRB Indictment, the government's concerns regarding premature discovery ring hollow.

Given the likelihood that the government will be able to cure the above-described deficiencies, it may seem like the Court's analysis is hyper-technical and merely delays the inevitable. But the Court cannot ignore the holes in the government's complaint for the sake of convenience. If people "must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." Niz-Chavez v. Garland, 141 S. Ct. 1474, 1486 (2021).[2]

## IV.   CONCLUSION

For the foregoing reasons, the Court grants Apte and Richman's motion to dismiss with leave to amend. The government may file an amended civil forfeiture complaint within 30 days of the date of this order.

**IT IS SO ORDERED.**

Dated: August 26, 2021.



CHARLES R. BREYER
United States District Judge

---

[2] The Court grants Gabriel Ceriotti's motions for joinder. See dkt. nos. 27, 32.