STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

CHRIS KALTSAS (NYBN 5460902)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Facsimile: (415) 436-7234
    Email: chris.kaltsas2@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 21-CV-04060 CRB |
| Plaintiff, | FIRST AMENDED VERIFIED COMPLAINT FOR CIVIL FORFEITURE *IN REM* |
| v. | |
| TWO CONDOMINIUMS LOCATED AT 465 OCEAN DRIVE, UNITS 315 AND 316, MIAMI BEACH, FLORIDA 33139 | |
| Defendants. | |

The United States of America, by its attorneys, Stephanie M. Hinds, Acting United States Attorney for the Northern District of California, and Chris Kaltsas, Assistant United States Attorney, brings this complaint and alleges as follows:

**NATURE OF THE ACTION**

1. This is a judicial forfeiture action *in rem*, as authorized by Title 18, United States Code, Sections 981 and 983, involving the seizure and forfeiture to the use and benefit of the United States of America the following property:

COMPLAINT FOR CIVIL FORFEITURE        1

1. Two condominiums located at 465 Ocean Drive, Units 315 and 316, Miami Beach, Florida 33139 (associated with APNs 02-42-03-097-0280 and 02-42-03-097-0290, respectively) (hereinafter, "Defendant Properties") as property, real or personal, involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1956, and as property which constitutes or is derived from proceeds traceable to violations of (1) healthcare fraud, in violation of Title 18, United States Code, Section 1347; and (2) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5. These properties are accordingly forfeitable to the United States pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 981(a)(1)(C).

2. This Court has jurisdiction under Title 18, United States Code, Section 981, and Title 28, United States Code, Sections 1345 and 1355, as the Defendant Properties were involved in a transaction or attempted transaction in violation of Title 18, United States Code, Sections 1956 and 1957; and the Defendant Properties constitute or are derived from proceeds obtained, directly or indirectly, from (1) healthcare fraud, in violation of Title 18, United States Code, Section 1347, by virtue of Title 18, United States Code, Section 1956(c)(7)(F); and (2) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5, by virtue of Title 18, United States Code, Sections 1956(c)(7)(F) and 1961(1)(D).

3. This action is timely filed in accordance with Title 18, United States Code, Section 983(a)(3)(A).

4. Venue is proper because acts giving rise to this forfeiture action occurred in the Northern District of California. *See* Title 28, United States Code, Sections 1355(b) and 1395(a).

5. Intra-district venue is proper in the San Francisco division within the Northern District of California.

**PARTIES**

6. Plaintiff is the United States of America.

7. The Defendant Properties are two condominiums located at 465 Ocean Drive, Units 315 and 316, Miami Beach, Florida 33139 (associated with APNs 02-42-03-097-0280 and 02-42-03-097-0290, respectively).

COMPLAINT FOR CIVIL FORFEITURE         2

**FACTS**

8. uBiome, Inc. ("uBiome"), was a Delaware corporation formed in or about October 2012. Beginning no later than in or about 2013, uBiome maintained and purported to maintain its principal place of business in the City and County of San Francisco in the Northern District of California.

9. ZACHARY SCHULZ APTE, who was also known as Zachary Apte and Zac Apte, was a co-founder, corporate officer, and director of uBiome.

10. JESSICA SUNSHINE RICHMAN, who was also known as Jessica Richman, was a co-founder, corporate officer, and director of uBiome.

11. On March 18, 2021, a Grand Jury in the Northern District of California indicted APTE and RICHMAN for fraudulent activity conducted through uBiome, specifically for violations of Title 18, United States Code, Section 1349, conspiracy to commit healthcare fraud; Title 18, United States Code, Section 1347, healthcare fraud; Title 18, United States Code, Section 1028A(a)(1), aggravated identity theft; Title 18, United States Code, Section 1343, wire fraud; Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, fraud in connection with the purchase and sale of securities; Title 18, United States Code, Section 1957, money laundering; and Title 18, United States Code, Section 2, aiding and abetting. Those charges are also accompanied by criminal forfeiture allegations.

<u>Conspiracy and Scheme and Artifice to Defraud Healthcare Benefit Programs</u>

12. No later than in or about November 2015, and continuing until in or about April 2019, APTE and RICHMAN knowingly and willfully, and with the intent to defraud, executed and attempted to execute a scheme and artifice to defraud healthcare benefit programs as to a material matter and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, money and property owned by, and under the custody and control of, those healthcare benefit programs, all in connection with the delivery of, and payment for, healthcare benefits, items, and services. Among other purposes, APTE and RICHMAN engaged in the scheme and artifice for the purpose of inducing and attempting to induce health insurance providers to pay money to uBiome, all in order to obtain funds for the operations of uBiome and the purchase of real properties for APTE's and RICHMAN's personal benefit; to make it appear to investors that healthcare providers'

orders for uBiome's clinical tests were routinely reimbursed by health insurance providers; and to make it appear to investors that such reimbursable orders were increasing on a monthly basis.

13. As part of the conspiracy to defraud healthcare benefit programs, APTE and RICHMAN developed, implemented, and oversaw a series of fraudulent practices designed to deceive approving healthcare providers and healthcare benefit programs with respect to tests that were not validated and not medically necessary. In addition, APTE and RICHMAN falsified documents and lied about and/or concealed material facts when insurance providers asked questions to which truthful answers would reveal the fraudulent nature of uBiome's billing model. These practices included (1) fraudulently submitting reimbursement claims for re-tests or re-sequencings of archived samples (referred to internally as "upgrades") between on or about October 2015 through on or about the end of 2018; (2) utilizing a captive network of doctors (the ECCN) and other providers who were incentivized to approve tests, but who were intentionally given partial and misleading information about the test requests they were reviewing between on or about October 2015 through on or about April 2019; (3) fraudulently submitting reimbursement claims for tests that had not been fully validated under relevant medical standards and/or for which patient test results had not yet been released, at various times between on or about November 2015 and at least April 2018; (4) manipulating dates of service to conceal from insurance providers uBiome's actual testing and marketing practices, and illicitly trying to maximize billings beginning in or about November 2015 through April 2019; (5) fraudulently failing to charge patients for patient responsibility required by insurers, and instead, in some cases, incentivizing the patients with gift cards, and then making misleading statements about or concealing those practices from insurance providers between on or about November 2015 and February 2019; and (6) falsifying documents, using the identity of doctors and other healthcare providers without their knowledge or authorization through their NPI numbers and other data, and lying to insurance providers in response to requests for information, overpayment notifications, requests for recoupment of billings, denials of reimbursement requests, and/or audits investigating uBiome's billing practices starting no later than April 2018 and continuing thereafter until July 2018. uBiome financially benefitted from the scheme between 2015 and 2019.

14. Beginning in or around April 2015 through or around November 2019, APTE and

RICHMAN derived a substantial amount of their income from payments from uBiome. The funding for these payments was sourced from the funds that uBiome, under APTE and RICHMAN's direction, obtained from healthcare benefits programs' reimbursements to uBiome as a direct result of the fraudulent activities described above along with the proceeds of securities fraud. In addition to and apart from their regular salaries from uBiome (which also constitute the proceeds of fraud), during this time APTE and RICHMAN transferred at least $1.8 million from uBiome's operating accounts to their personal accounts, all of which represented the proceeds of the above-described healthcare fraud. As these profits resulted from APTE's and RICHMAN's execution of a scheme to obtain, by means of false or fraudulent pretenses, representations, or promises, money under the control of healthcare benefit programs, these funds constitute, or are traceable to, the proceeds of healthcare fraud, a specified unlawful activity. The payments obtained from healthcare benefits programs were substantially commingled with funds obtained from APTE's and RICHMAN's securities fraud scheme in their respective personal bank accounts and uBiome's operating accounts, as detailed below. Moreover, APTE, RICHMAN, and their employees steadily transferred these funds from uBiome's business accounts to various financial accounts held by APTE and RICHMAN over the course of several years, as detailed below.

15. Payments from healthcare payers were generally routed through and to accounts held at banks insured by the Federal Deposit Insurance Corporation, and as noted above, came from various healthcare benefit programs, including some benefit programs under the control and supervision of federal agencies.

<u>Conspiracy, Scheme, and Artifice to Defraud Investors and Potential Investors</u>

16. From 2015 until in or about April 2019, in the Northern District of California and elsewhere, APTE and RICHMAN knowingly, and with the intent to defraud, devised and intended to devise a scheme and artifice to defraud investors and potential investors (collectively, "investors") as to material matters, and to obtain money and property from investors by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, using means and instrumentalities of interstate commerce. Among other purposes, APTE and RICHMAN engaged in the scheme and artifice in order to induce and attempt to induce investors to invest funds in equity and

debt issued by uBiome, which funds were used both to pay for the operations of uBiome and to personally enrich APTE and RICHMAN.

17. As part of the conspiracy, scheme, and artifice to defraud investors, APTE and RICHMAN developed, implemented, and oversaw an effort to deceive and mislead investors about various aspects of uBiome's business including, but not limited to, the success of uBiome's business model in terms of revenues and reimbursement rates; the threats to future revenues represented by uBiome's failure to collect patient responsibility, marketing of upgrades, and reliance on the ECCN to generate orders; and the lack of clinical utility and acceptance in the medical community of uBiome's tests. As part of this effort, APTE and RICHMAN made and caused to be made various material misrepresentations and false and misleading statements and omissions to investors from late 2015 through in or about early 2019.

18. Specifically, APTE and RICHMAN caused numerous investors to transfer funds to APTE, RICHMAN, and uBiome using the Federal Reserve's Fedwire system, which uses computers and servers located outside the Northern District of California, for purposes of investment based on the above-mentioned material misrepresentations and omissions. During uBiome's Series B fundraising round between 2015 and 2016, APTE and RICHMAN told investors via email that uBiome generated revenues from health insurance providers related to "clinical billing" in excess of $200,000; that its billings had generated a high average selling price and that more than eighty percent of claims uBiome had submitted had been paid "by 50 days." APTE and RICHMAN knew that these revenue representations were false and misleading because they knew that each of the following was far less than that which investors were led to believe: (i) the total amount of money actually paid by health insurance providers to uBiome, (ii) the average amount of money that uBiome had received per claim from insurers based on the total of all claims submitted, and (iii) the percentage of claims paid within 50 days of submission. Moreover, in their emails to investors at around this time, APTE and RICHMAN misrepresented the nature of the claims being made to healthcare benefit programs by leading investors to believe that the cost of uBiome's test was covered under a specific medical billing code, when in actuality, APTE and RICHMAN knew that was inaccurate because uBiome had been testing various medical billing codes in an attempt to optimize reimbursement claims. These misrepresentations were

material to investors' decisions to invest in uBiome.

19.  Between 2017 and 2018, during uBiome's Series C fundraising round, APTE and RICHMAN concealed the fact that the majority of doctors and other healthcare providers who ordered uBiome's tests received only the information about uBiome's customers that uBiome chose for them to receive. These misrepresentations, too, were made over email. Relatedly, APTE and RICHMAN concealed from investors that much of uBiome's purported revenue growth from late 2017 through 2018 pertained to reimbursement claims related to upgraded tests used upon archived samples. Accordingly, APTE and RICHMAN made it appear to investors that the company was experiencing sustained organic growth, when in fact, and as APTE and RICHMAN knew, a large part of uBiome's purported revenues grew out of the company's efforts to fraudulently induce healthcare providers to order upgrades with respect to existing customers' archived samples, *i.e.*, retesting previously tested samples without the knowledge or authorization of the patients submitting them.

20.  Furthermore, in their emails to investors, APTE and RICHMAN concealed the fact that at the time of the Series C fundraising round, certain health insurance providers had conducted audits of, and/or made recoupment requests or overpayment notifications regarding, uBiome's historical reimbursement claims and that those audits and requests had revealed to APTE and RICHMAN that certain of uBiome's business practices—including its failure to collect patient responsibility and its re-testing and re-billing of archived samples—endangered uBiome's ability to obtain reimbursement from health insurance providers and could subject uBiome to large recoupment requests from insurance providers on its past and ongoing practices. APTE and RICHMAN thus omitted to tell investors that insurance providers' inquiries into uBiome's billing practices called uBiome's entire business model into question. These misrepresentations were material to investors' decisions to purchase Founders Shares from APTE and RICHMAN.

21.  As noted below, APTE, RICHMAN, and uBiome all received the proceeds of the securities fraud activity via wires through the Fedwire system or interbank transfers into their respective financial accounts using banks insured by the Federal Deposit Insurance Corporation. In mid to late 2016, uBiome's Series B investors transferred approximately $16.2 million into uBiome's business accounts in exchange for uBiome stock and Founders Shares before APTE and RICHMAN wired some

of those funds to their respective personal accounts. In 2017 and 2018, APTE and RICHMAN obtained compensation through the sale of convertible notes and promissory notes, all at around the same time APTE and RICHMAN made material misrepresentations to investors. Finally, in and around August 2018 and through the end of 2018, uBiome held its Series C fundraising round, during which APTE and RICHMAN collectively sold approximately $10 million worth of their personal Founders Shares to various Series C investors. Significant investors in the Series C round also purchased nearly $50 million of uBiome stock. Those funds were wired to APTE's and RICHMAN's personal accounts, as well as through uBiome's accounts.

22. In sum, by virtue of their misrepresentations, misleading statements, and omissions, APTE and RICHMAN induced numerous investors to invest tens of millions of dollars in uBiome equity and debt, as well as to purchase over $12 million worth of uBiome Founders Shares from APTE and RICHMAN themselves. As noted below, these funds were eventually used to purchase real property, among other things. Payments from each of the investors described herein were routed through and to accounts either through FedWire or through interbank transfers using accounts held at banks insured by the Federal Deposit Insurance Corporation.

## Proceeds of Fraudulent Activities

23. The proceeds of the healthcare fraud activities described above generally accrued first to accounts maintained by uBiome before being transferred to APTE and RICHMAN in the form of salary payments and direct transfers. Beginning no later than 2017, uBiome began accruing profits from healthcare payers through, as stated above, numerous means of fraudulent activity. uBiome received a total of $3,335,117.03 from healthcare benefit programs by way of 761 financial transactions in 2017. Throughout 2018, uBiome accumulated $26,152,976.17 in healthcare payments through 7,751 transactions. At all times relevant to this complaint through April 2019 and beyond, APTE and RICHMAN received salary payments from uBiome on a regular basis, all of which was derived at least in part from fraudulently obtained funds.

24. The proceeds of APTE's and RICHMAN's securities fraud activity accrued to uBiome's business banking accounts as well as APTE's and RICHMAN's personal accounts. uBiome's Series B investors wired approximately $16.2 million into uBiome's business accounts between approximately

1  May 2016 and September 2016, in exchange for uBiome stock and Founders Shares. These payments included wire transfers to APTE and RICHMAN from uBiome's account, totaling approximately $1.2 million each for a portion of their respective Founders Shares.

25. Beginning in 2017, APTE and RICHMAN obtained financing for uBiome through the issuance of convertible notes to investors, again through misrepresenting vital aspects of uBiome's business. Specifically, three investment funds transferred approximately $9 million to the uBiome account in exchange for convertible notes in July and August 2017.

26. uBiome obtained further investor financing in 2018 through the issuance of promissory notes and additional investments. Specifically, uBiome obtained approximately $1.8 million through the issuance of promissory notes to four separate investment funds in early 2018. Shortly thereafter, in and around August 2018, uBiome began its Series C fundraising round, during which APTE and RICHMAN collectively sold approximately $10 million worth of their personal Founders Shares to various Series C investors. Other significant investors in the Series C round purchased over $50 million of uBiome stock.

27. Because there are over one dozen financial accounts involved in the instant case and the funds within them were subject to hundreds, if not thousands, of deposits, withdrawals, and transfers, the government was required to evaluate the status of the funds as either being traceable to the proceeds of specified unlawful activities,[1] or as "other funds." Generally, the government considers funds traceable to fraudulently obtained deposits from healthcare benefit programs to be funds traceable to a specified unlawful activity for purposes of forfeiture. The government also considers funds obtained from investors as a result of securities fraud activity to be traceable to specified unlawful activity for purposes of forfeiture.

28. Conversely, to the extent that wires could not be concretely linked to the fraudulent activity described above, they are considered as "other funds" in the government's analysis. The government analyzed the bank accounts at issue herein by ensuring that any "other funds" in a bank account were processed through account withdrawals before any of the funds traceable to a specified unlawful activity were processed, regardless of when any particular deposit was made. This analysis,

---

[1] For purposes of this analysis only, "specified unlawful activity funds" refers to the proceeds of healthcare fraud and securities fraud as well as funds or property involved in money laundering offenses.

COMPLAINT FOR CIVIL FORFEITURE            9

known as the application of the "lowest intermediary balance rule" (or "LIBR"), is a widely used method of tracing funds attributable to specified unlawful activities through accounts containing funds from both specified unlawful activities and other sources. The government's analysis adheres to the principles underlying the LIBR method in a consistent manner.

29. The effect of this analysis is that any "other funds" deposited into an account are deemed to have been spent before any funds deemed traceable to specified unlawful activities, no matter how long the specified unlawful activity funds were in their respective accounts. There are accordingly instances in which funds traceable to specified unlawful activities were not used for purchases until substantial amounts of time had passed because of large transfers of "other funds" and relatively sparing use of several high-balance financial accounts important to this analysis. Some of the transfers made between accounts belonging to uBiome, APTE, and RICHMAN as early as 2016 are accordingly important for understanding expenditures made as late as 2020, including the purchase of the Defendant Properties. APTE and RICHMAN both maintained numerous personal and business accounts, some of which were opened in the names of nominees during the course of conduct described above, and all of which had significant activity with respect to both "other funds" and specified unlawful activity funds.

30. In 2017, APTE and RICHMAN began the process of forming the first of many legal trusts through which they would buy and sell properties. The first of these, the Juniper Revocable Trust, was formed on August 31, 2017. The trust was initially capitalized with $4,000 in September 2017. Shortly thereafter, on September 8, 2017, APTE and RICHMAN applied for a mortgage on a property located at 1025 NE 5th Avenue, Camas, Washington 98607 ("the Camas property"). Subsequently, on October 12, 2017, APTE and RICHMAN each transferred $50,149.36 (a total of $100,298.72) from their personal financial accounts to the Juniper Revocable Trust's bank account. These transfers covered the down payment for the property, for which APTE and RICHMAN paid approximately $485,000. Notes on the transfers indicated that the transfers were for a down payment for the Camas property. The funds used for this initial down payment were traceable to "other funds," *i.e.,* funds with no discernible illicit source. The initial deposit on the Camas property was thus not traceable to any particular specified unlawful activity.

31. APTE and RICHMAN then conducted several real estate transactions in late 2019 and

early 2020. On September 4, 2019, RICHMAN and APTE each transferred $186,984.62 from their personal bank and investment accounts (totaling $373,969.24). The bank account that APTE used to fund his half of the transaction had been funded in its entirety by a secondary bank account, and the vast majority of the funds used to fund that secondary bank account were derived from specified unlawful activities. Specifically, the primary bank account was funded with a $5 million dollar transfer on January 25, 2019, of which all but $700 had been funded by investors' purchases of Founders Shares from the Series C fundraising round in August 2018. Some of the investors' Series C transfers went to APTE directly, whereas some of the funds for the purchase of securities were transferred to uBiome's business account, where the proceeds of the healthcare fraud were also located. Funds that were transferred to uBiome's business account were eventually transferred to APTE's secondary account and used to fund APTE's portion of the transfer to pay the mortgage on the Camas property. All of the funds transferred from APTE's secondary account to Wells Fargo Bank were derived from specified unlawful activity. Although these funds had been transferred to APTE as part of the Series C fundraising in 2018, the funds remained in their respective accounts through 2019 as APTE did not use the account on a regular basis.

32. The financial account that RICHMAN had used to fund her portion of the transfer had been open since 2014 and contained the proceeds of securities fraud obtained during the Series B fundraising round. Investors' funds from that round of fundraising were transferred to RICHMAN's account in December 2016 and January 2017 from uBiome's business account, which contained the proceeds of APTE's and RICHMAN's healthcare fraud activities. At the time of the transfer to Wells Fargo Bank, RICHMAN's personal account also contained proceeds deposited directly into that account which are traceable to the fraudulent sale of Founders Shares to investors in August 2018. Consequently, all of the funds transferred from RICHMAN's personal account to Wells Fargo Bank are traceable to specified unlawful activities.

33. Both transfers to Wells Fargo Bank were sent with notations indicating the purpose of the transfers was to pay the balance of the mortgage on the Camas property. Both transfers were made with only the proceeds of APTE's and RICHMAN's fraudulent activities.

34. APTE and RICHMAN sold the Camas property on January 28, 2020 for $600,000. The

net proceeds from the sale were $555,055.91, which were wired from the Chicago Title Company to the trust account of ATTORNEY 1 at the time of sale. The funds were held in trust until the purchase of the Defendant Properties, specifically, two condominiums located at 465 Ocean Drive, Units 315 and 316, Miami Beach, Florida 33139. These properties were both purchased on February 21, 2020; Unit 315 sold for $510,000 and Unit 316 sold for $500,000.

35. The purchase of the Defendant Properties was conducted entirely in cash, most of which was transferred from the trust account of ATTORNEY 1 and stemmed from the sale of the Camas property. The remaining funds used to purchase the Defendant Properties were transferred through and among financial accounts, escrow companies, and trusts over the course of thirteen transfers from eight separate accounts belonging to APTE and RICHMAN. These funds were almost entirely derived from the proceeds of securities fraud (to wit, the Series C fundraiser), which had first been wired into APTE's and RICHMAN's personal accounts before they were wired to numerous secondary personal accounts and, subsequently, the escrow account established for the sale of the Defendant Properties. Specifically, after being deposited into APTE's and RICHMAN's accounts, the proceeds of the securities fraud were commingled with the proceeds of the healthcare fraud; transferred to various other accounts in APTE's and RICHMAN's names between 2018 and 2019, including brokerage accounts and accounts held in the names of nominee corporations with no discernible business purpose; and subsequently transferred among APTE's and RICHMAN's various accounts numerous times before being used to pay for the Defendant Properties. The Defendant Properties accordingly constitute, or are traceable to, the proceeds of specified unlawful activity, rendering them forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C).

36. Moreover, these properties are involved in money laundering. The means and methods of paying for these homes, including a series of complicated financial transactions utilizing interstate wires through the Fedwire system; the use of interbank transfers among accounts held at banks insured by the Federal Deposit Insurance Corporation; the use of various intermediary accounts, trusts, and companies; and the use of an intermediary individual (ATTORNEY 1) all indicate that the purpose of the transfer was to conceal the nature, source, and location of the proceeds of specified unlawful activities. Therefore, the Defendant Properties are subject to forfeiture as property involved in a transaction or

attempted transaction in violation of Title 18, United States Code, Section 1956 (money laundering) pursuant to Title 18, United States Code, Section 981(a)(1)(A). In addition, because each wire transfer used to pay for the Defendant Properties contained more than $10,000 in proceeds of specified unlawful activities, the Defendant Properties are also subject to forfeiture pursuant to Title 18, United States Code, Sections 1957 and 981(a)(1)(A).

37. Finally, APTE and RICHMAN have also engaged in several international transfers of funds indicative of money laundering activity. Neither APTE nor RICHMAN have been present in the United States since mid-2020. They have nevertheless transferred hundreds of thousands of dollars among their various bank accounts to their brokerage accounts at Fidelity Investments beginning in early 2020. APTE and RICHMAN subsequently transferred all of their funds in certain brokerage accounts to their other personal bank accounts in March 2020. In August of 2020, APTE and RICHMAN transferred over $750,000 to banks located in Great Britain and Germany, using their primary bank and financial accounts. Subsequently, on January 4, 2021, APTE and RICHMAN each sent $50,000 (totaling $100,000) to ATTORNEY 1's trust account, noting that the money was to be spent for a construction escrow on the Defendant Properties. At least one of these accounts was used to funnel money collected from several accounts across various financial institutions prior to transferring the money internationally to Germany.

38. Therefore, as the transactions for the Defendant Properties constituted a series of real estate transactions that appear to have been designed to conceal the illicit nature of funds, the Defendant Properties are involved in money laundering and are thus forfeitable to the United States. The Defendant Properties are also forfeitable under a money laundering theory because (1) the funds transferred to ATTORNEY 1 for the purpose of improving the Defendant Properties constitute proceeds of securities and healthcare fraud; (2) $100,000 of those funds were spent on the Defendant Properties; and (3) those funds were in an account used to conceal those proceeds.

**CLAIM FOR RELIEF**

39. The United States incorporates by reference the allegations in paragraphs 1 through 38 as though fully set forth herein.

40. Title 18, United States Code, Section 981(a)(1)(A) subjects any property, real or personal, involved in a transaction in violation of Title 18, United States Code, Section 1956 (money laundering) to forfeiture to the United States.

41. Title 18, United States Code, Section 981(a)(1)(C) subjects any property, real or personal, which constitutes or is derived from proceeds traceable to proceeds of any specified unlawful activity to forfeiture to the United States.

42. Title 18, United States Code, Section 1956(a)(1)(B)(i) prohibits a person from conducting or attempting to conduct a financial transaction when knowing that the property involved in said transaction represents the proceeds of some form of unlawful activity, and when knowing that said transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

43. Title 18, United States Code, Section 1957 prohibits a person from engaging or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

44. Title 18, United States Code, Section 1347 prohibits a person from executing, or attempting to execute, a scheme or artifice to defraud any healthcare benefit program, or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property under the control of a healthcare benefit program in connection with the delivery of or payment for healthcare benefits, services, or items.

45. Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5 prohibits a person from using or employing any manipulative or deceptive device or contrivance in connection with the sale of securities using means and instrumentalities of interstate commerce.

46. A violation of Title 18, United States Code, Section 1347 is a "specified unlawful activity" for purposes of Title 18, United States Code, Section 981, by virtue of its reference to Title 18, United States Code, Section 1956(c)(7)(F).

47. A violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations is a "specified unlawful activity" for purposes of Title 18, United States Code,

Section 981, by virtue of its reference to Title 18, United States Code, Section 1956(c)(7)(A), which incorporates Title 18, United States Code, Section 1961(1)(D) (listing "fraud in the sale of securities" as a specified unlawful activity).

48.     In light of the foregoing, and considering the totality of the circumstances, it is more likely than not that the Defendant Properties represent property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Sections 1956 and 1957. Moreover, in light of the foregoing and considering the totality of the circumstances, it is more likely than not that the Defendant Properties are property constituting, or derived from, proceeds traceable to the commission of an offense defined as a "specified unlawful activity." The Defendant Properties listed herein are thus subject to forfeiture under Title 18, United States Code, Sections 981(a)(1)(A) and 981(a)(1)(C), respectively.

*****

WHEREFORE, the United States requests that due process issue to enforce the forfeiture of the above listed Defendant Properties; that notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; that the Court enter a judgment forfeiting the Defendant Properties to the United States; and that the United States be awarded such other relief as may be proper and just.

DATED: September 24, 2021                         Respectfully submitted,

                                                  STEPHANIE M. HINDS
                                                  Acting United States Attorney


                                                           /s/
                                                  CHRIS KALTSAS
                                                  Assistant United States Attorney

**VERIFICATION**

I, Elaine Farrell, state as follows:

1. I am a special agent with the Department of Defense Office of Inspector General, Defense Criminal Investigative Service. I am an agent assigned to this case. As such, I am familiar with the facts and the investigation leading to the filing of this Complaint for Forfeiture.

2. I have read the Complaint and believe the allegations contained therein to be true.

\* \* \* \* \*

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23 day of September, 2021, in Oakland, California.

Elaine Farrell
Special Agent
Defense Criminal Investigative Service

COMPLAINT FOR CIVIL FORFEITURE                    1